UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | x | |
| | : | |
| Trailer Bridge, Inc.,[1] | : | Case No. 3:11-bk-08348 -[JAF] |
| | : | |
| | : | Chapter 11 |
| Debtor. | : | |
| | : | |
| _____/ | x | |

## CHAPTER 11 CASE MANAGEMENT SUMMARY

Trailer Bridge, Inc., a debtor and debtor in possession in the above-captioned case ("Trailer Bridge", the "Company" or the "Debtor"), by and through the undersigned counsel, hereby files this verified Chapter 11 Case Management Summary (the "Case Summary") in accordance with the *Administrative Order Establishing Initial Procedures in Chapter 11 Cases filed in the United States Bankruptcy Court of the Middle District of Florida* entered by this Court on January 28, 2009. In support of this Case Summary, Mr. Mark A. Tanner, the Debtor's Co-Chief Executive Officer and Chief Financial Officer declares, under penalty of perjury, that the facts set forth below are true and correct to the best of his knowledge.

## I.    DESCRIPTION OF THE DEBTOR'S BUSINESS

1.    Trailer Bridge is a publicly-traded,[2] integrated trucking and marine freight carrier company that provides freight transportation between the continental United

---

[1]    The Debtor's taxpayer identification number is 13-3617986. The mailing address for the Debtor, solely for purposes of notices and communications is 10405 New Berlin Road East, Jacksonville, Florida 32226.

[2]    As of the Petition Date, the Debtor traded on the Nasdaq Global Market under the symbol "TRBR".

States, Puerto Rico, and the Dominican Republic operated under the Jones Act.[3]   The

Company has a diverse customer base and ships a wide variety of goods and products to

and from the United States.  Typical shipments to Puerto Rico from the United States

include furniture, consumer goods, raw materials for manufacturing, electronics, new and

used automobiles, and apparel.  The typical shipments from Puerto Rico to the United

States include healthcare products, pharmaceuticals, electronics, shoes, and recyclables.

Typical shipments to the Dominican Republic are made from the Untied States via Puerto

Rico and consist of materials for manufacturing.  Typical shipments from the Dominican

Republic to the United States include apparel, raw materials for manufacturing, and

recyclables.[4]

     2.     Trailer Bridge is the only Jones Act company serving both the Puerto Rico

and Dominican Republic markets with Jones Act qualified vessels.  The Debtor services

these markets though its marine fleet.  This fleet consists of two 736 foot long triple-

deck, roll-on/roll-off ocean going barges (each a, "Ro/Ro") and five 403 foot long

triplestack box carriers (each a "TBC").  These marine vessels are fully configured to

carry 53 foot long, 102 foot wide, "high-cube" cargo containers, which the Company

believes provides operating efficiencies that are not available to ocean carriers using

traditional, smaller capacity equipment (i.e., 40 foot containers).  Trailer Bridge uses a

"tug & barge" model, that it believes results in lower costs per unit mile at sea compared

---

[3]     What is commonly known as the Jones Act is section 27 of the Merchant Marine Act of 1920, most of the provisions of which are found in title 46 U.S.C. §§ 55102, 55103, and 55109.

[4]     The Debtor's shipping schedule for its southbound ships, leaves Jacksonville, Florida and arrives in San Juan, Puerto Rico about six days later.  From San Juan, Puerto Rico, the Debtor's northbound ships either simply return to Jacksonville while others are scheduled to return to Jacksonville via Puerto Plato, Dominican Republic, with the journey to the Dominican Republic usually taking about two days.

to self-propelled vessels. Importantly, the Company's marine vessels have an average age of 16 years, which is half the age of its competitors' vessels.

3.    The Company's trucking equipment includes a fleet of tractors, trailers, vehicle transport modules, nearly 4,000 containers and over 3,100 chassis. The Debtor uses these assets to transport freight over land between places in the continental United States and the Debtor's Jacksonville port facility. Certain of this equipment is also used to transport freight over the water to its facility in San Juan, Puerto Rico and to the Dominican Republic.

## II.    LOCATIONS OF DEBTOR'S OPERATIONS AND WHETHER LEASED OR OWNED

4.    The Company's headquarters and its centralized dispatch and customer service center are located in a building owned by the Debtor in Jacksonville, Florida. Trailer Bridge also leases offices in Woodcliff Lake, New Jersey; Charlotte, North Carolina; Chicago, Illinois; Rockville Centre, New York; Santo Domingo, Dominican Republic; and San Juan, Puerto Rico. Additionally, the Debtor leases its port facilities in Jacksonville, Florida, San Juan, Puerto Rico and Puerto Plata, Dominican Republic.

## III.    REASONS FOR FILING CHAPTER 11

### A.    The Debtor's Capital Structure

#### (i)    *The Wells Term Loan*

5.    The Debtor and Wells Fargo, N.A. ("Wells") are parties to that certain Term Loan and Security Agreement, by and among Trailer Bridge, Inc., as borrower, and Wells Fargo, N.A., as successor in interest to Wachovia Bank National Association, as Agent and the Lenders from Time to Time Party Hereto, dated June 14, 2007  (the "Wells

Term Loan"). The Wells Term Loan is secured by a first lien on eligible equipment (the "Term Loan Collateral"), the value of which the Debtor estimates at $13.9 million as of June 30, 2011. There is presently no junior lien on this collateral.

6.    Under the Wells Term Loan, the Debtor had access to $10 million until April 2012, upon which the Company could draw to fund eligible equipment purchases. Interest accrued on the Wells Term Loan at a rate equal to 2% plus prime. The Wells Term Loan principal is amortized over a 72 month period, ending in December 2014, and as of the Petition Date, the outstanding obligations under the Wells Term Loan were approximately $4.4 million. Additionally, the Company has been in default under the Wells Term Loan since October 24, 2011, however, Wells had agreed to forbear from exercising remedies through November 15, 2011.

### (ii)    *The Wells Revolver*

7.    The Debtor and Wells are also parties to that certain Loan and Security Agreement, by and among Trailer Bridge, Inc., as borrower, and Wells Fargo, N.A., as successor in interest to Congress Financial Corporation (Florida), as Agent, and the Lenders from Time to Time Party Hereto, dated April 23, 2007 (the "Wells Revolver"), which expires in April 2012. The Wells Revolver is secured by a first lien on the Company's accounts receivable and certain of the Company's equipment, (the "Revolver Collateral").

8.    Under the Wells Revolver, the Company was provided a maximum availability of $10 million. This revolving line of credit is subject to a borrowing base formula based on a percentage of eligible accounts receivable, and absent a default,

interest accrued on funds borrowed under the Wells Revolver at a rate equal to 1.5% per annum in excess of the prime rate. As a result of various defaults and waivers, the interest on the revolver was increased by an additional 2%. Notwithstanding the existing defaults, Wells has continued to make advances under the Wells Revolver pursuant to forbearance agreements and as of November 15, 2011 the amount outstanding under the Wells Revolver was approximately $5.9 million.

### *(iii)    The MARAD Bonds*

9.     Trailer Bridge is also party to two Ship Financing Bonds, both of which are guaranteed by the United States Government under Title XI of the Merchant Marine Act of 1936 in connection with the Federal Ship Financing Program (collectively, the "MARAD Bonds").

10.     Specifically, on June 23, 1997, the Debtor, as a ship owner, entered into that certain Trust Indenture Relating to United States Government Guaranteed Ship Financing Obligations with State Street Bank and Trust Company, as Indenture Trustee,[5] under which the Debtor was authorized to issue up to an aggregate principal amount of $10,515,000 of bonds designated as "United States Government Guaranteed Ship Financing Bonds, 1997 Series". That issuance of MARAD Bonds bears interest at a rate of 7.07% per annum and matures on September 30, 2022 (the "7.07% MARAD Bonds"). The 7.07% MARAD Bonds are secured by a first lien on certain of the TBCs that have a combined appraised fair market value of $21,542,858 as of June 28, 2010 (the "7.07% MARAD Bond Collateral"). As of October 31, 2011, the total outstanding on the 7.07%

---

[5] The successor Indenture Trustee for MARAD Bonds is U.S. Bank National Association.

MARAD Bonds was $5,104,475.  There is presently no default with respect to the 7.07%

MARAD Bonds, and the next scheduled payment on the Bonds is March 30, 2012 in the

amount of $232,022 in principal, and $180,443 in interest.

11.     Additionally, on December 4, 1997, the Debtor, as ship owner, entered

into that Certain Trust Indenture Relating to the United States Government Guaranteed

Ship Financing Obligations with State Street Bank and Trust Company, as Indenture

Trustee, under which the debtor was authorized to issue up to an aggregate principal

amount of  $16,918,000 of bonds, designated as "United States Government Guaranteed

Ship Financing Bonds, 1997 Series II".  These MARAD Bonds bear interest  at a rate of

6.52% per annum and mature on March 30, 2023 (the "6.52% MARAD Bonds").  The

6.52% MARAD Bonds are secured  by a first lien on the TBCs other than those that

secure the 7.07% MARAD Bonds (the "6.52% MARAD Bond Collateral" and together

with the 7.07% MARAD Bond Collateral, the "MARAD Bond Collateral").  The 6.52%

MARAD Bond Collateral has a combined appraised fair market value of $32,750,001 as

of June 28, 2010.

12.     As of October 31, 2011, the total outstanding on the 6.52% MARAD

Bonds was $8,565,858.  There is presently no default under the 6.52% MARAD Bonds,

the next scheduled payment on these bonds is March 30, 2012, and the amount of that

payment is $372,429 in principal and $279,247 in interest.

13.     In connection with obtaining the consent of the Secretary of

Transportation of the United States of America to offer and sell the MARAD Bonds, the

Company was from time to time required to deposit funds into a reserve fund that serves

as additional security for the Company payment obligations with respect to MARAD

Bonds, the "MARAD Reserve Fund").  As of November 15, 2011, there is approximately

$3,557,942.94 in the MARAD Reserve Fund.

> *(iv)   The Senior Secured Notes*

14.     Trailer Bridge is also a party to that certain 9.25% Senior Secured Notes

Due 2011 Indenture, dated as of December 1, 2004, under which the Debtor issued notes

in the principal amount of $85 million (the "Senior Secured Notes").  The Senior Secured

Notes matured on November 15, 2011.

15.     Prior to their maturity, the Company redeemed $2.5 million of the Senior

Secured Notes through open market purchases, leaving $82.5 million in outstanding

principal amount of the Senior Secured Notes.   Interest due and owing as of the

November 15, 2011 maturity date was approximately $3.8 million, leaving a fixed,

liquidated balance due and owing to the holders of approximately $86.3 million.  The

Company did not make any payment on the Senior Secured Notes on the maturity date

and is therefore in payment default.

16.     The Senior Secured Notes are secured by a first priority lien on the

Debtor's two Ro/Ro barges, certain equipment consisting of container and chassis

equipment, and the Debtor's Jacksonville, Florida, office and terminal, including

associated real estate (the "Senior Secured Note Collateral").   Based upon relatively

recent appraisals of the Senior Secured Note Collateral, the Debtor believes that the

obligations owing under the Senior Secured Notes are significantly undersecured.

*(v)* ***Unsecured Debt***

17.     The Company also has trade debt in the total amount of approximately $3 to $4 million.  This debt consists primarily of trade obligations owing to third party vendors who provide docking, fuel, and services associated with ground transportation, many of whom are parties to contracts.  Most of this debt is a result of normal course credit terms with such trade vendors.  In addition, depending on the collateral coverage on the Senior Secured Notes, the holders of such Notes may have a very significant unsecured deficiency claim.

*(vi)* ***Equity***

18.     As of November 9, 2011, the Company had authorized 20,000,000 shares, of which 12,102,587 are issued.  In addition, the Company had 1,000,000 authorized preferred shares, none of which have been issued.

**B.     The Debtor's Out Of Court Restructuring Efforts**

19.     Anticipating that a number of the secured obligations set forth above, including the Senior Secured Notes, would be maturing in mid to late 2011, the Company embarked upon a process to refinance or otherwise address their existing debt.  With respect to that process, Trailer Bridge hired the investment banking firm of Global Hunter Securities, LLC ("GHS") who launched a process to seek out secured financing from potential first and second lien lenders.  The process resulted in a potential lender being selected that undertook significant due diligence.  That potential investor, however, stopped the process upon learning that there was a pending Department of Justice investigation of the Debtor's competitors.

20.    Notwithstanding the investor stepping away from the transaction, a potential first lien lender was identified and while that lender conducted significant due diligence, GHS began soliciting interest in a second lien position that would have enabled the Company to retire the Senior Secured Notes on their maturity date.  This process continued into the first quarter of 2011 and over 20 management presentations were made.  Ultimately, a second a second lien lender was chosen and the parties moved to documenting refinancing.  Unfortunately, during the documentation stage the parties ran into material differences regarding an intercreditor agreement and negotiations were terminated.

21.    During this same time period, Trailer Bridge released its year-end financial results as well as its 2011 first quarter indications.  Both of these were below expectations and, thus, deterred "traditional" lender and investor interest in a refinancing transaction.  Accordingly, in the second quarter of 2011, the Debtor and GHS solicited investor interest in other types of transactions, and in the early part of the third quarter of 2011, multiple parties provided term sheets for alternative financing transactions that included a first lien financing.  The Company pursued two such structures, but ultimately neither of parties were able to arrange for the financing necessary to consummate a transaction.  Towards the end of this process, the Company was also approached about a potential merger transaction.  Again, the Company pursued that transaction, however, no agreement could be reached and the parties broke off negotiations.

22.    Thus although the Company with the help of GHS and its other advisers has vigorously pursed an out of court restructuring of its balance sheet, its was unable to

finalize any such transaction prior to the Senior Secured Notes maturing on November 15, 2011.  Importantly, throughout this process and especially in the last two months, the Debtor has been in contact with its three most significant holders of the Senior Secured Notes and attempted to keep them apprised of their efforts upon those holders signing appropriate non disclosure agreements ("NDAs").

C.     The Debtor's Recent Performance

23.     While the Debtor's inability to refinance its maturing obligations, including the Senior Secured Notes, is the event that has resulted in Trailer Bridge commencing this Chapter 11 Case, until very recently the Company had been suffering falling EBITDA and a deteriorating cash position caused by market conditions in the industry and the general macro economy.  For example, the Debtor has faced significant increases in fuel and operating costs and interest rates, that have not been fully offset by increases in freight rates or fuel surcharges.  Moreover, the economic recession in the United States and other countries and increased competition for less freight has materially effected the Debtor's operating results.  For example, beginning in 2010, the Debtor experienced a consistent loss of market share in the Puerto Rican market as a result of these factors, and exacerbating this downturn is the fact that as of December 31, 2010, more than 10% of the Debtor's trade accounts receivable depended on funding from the Puerto Rican government, which pays these on a more delayed basis than other customers.  In addition, due to trade imbalances between U.S. and Puerto Rico and the Dominican Republic, northbound voyages are generally under-utilized in comparison to southbound voyages.  Furthermore despite the Debtor operating weekly sailings to the

Dominican Republic between its customary northbound route from Puerto Rico to Jacksonville, Florida in 2007 and thereby enhancing utilization of its northbound route, the trade imbalance has had a marketed negative effect on the Debtor's business.

24.     Finally, in 2007, the entire Puerto Rican trade lane was implicated in a price fixing investigation by the Department of Justice, and approximately 40 lawsuits were filed by shippers against domestic ocean carriers, including the Debtor and many of its competitors.   While neither the Debtor nor any of its employees were specifically targeted as part of the DOJ investigation and the class action civil claims filed against the Debtor were ultimately dismissed with prejudice, the costs and collateral effect of these proceedings has had a negative effect on the Debtor's financial position, liquidity, and cash flow.

### D.     The Alternatives and Objectives of the Chapter 11 Filing

25.     During the Company's   solicitation of transactions for an out of court refinancing or other transaction, Trailer Bridge received proposals and indications of interest for a possible sale of substantially all of its assets under section 363 of the Bankruptcy Code.   At the present time, the Debtor does not intend to pursue such a transaction because of its unique tax treatment and the potential detriment to unsecured creditors and equity holders.   Specifically, as a result of the Company opting in to a tonnage tax program made available to certain ship owners, the Company could face significant tax liabilities if it sold its assets, which liabilities might not be able to be shielded by the Company's net operating losses.

26.     Accordingly, by commencing its Chapter 11 Case, the Company is seeking to effect a restructuring of its capital structure and debt obligations through a plan of reorganization and to emerge as a reorganized company with a strong balance sheet enabling it to compete in the shipping and trucking lanes in which it presently does business.  In that regard, the Company presently intends to file a plan of reorganization and disclosure statement within the first 30 days after the Petition Date, and will seek to emerge from bankruptcy within 90 to 120 days as a stand alone reorganized company. Like the proposed pre-bankruptcy transactions with financiers and investors, the plan of reorganization will place control of the Company in the hands of those parties that presently have the greatest economic interest in the Company's success, but preserve some value for the current equity holders if the Company performs as the Board and management believe it can.

IV.     **LIST OF OFFICERS AND DIRECTORS AND THEIR SALARIES AND BENEFITS AT TIME OF FILING AND DURING 1 YEAR PRIOR TO FILING**

A.     **Board of Directors**

27.     Allen L. Stevens has served as Chairman of the Trailer Bridge board of directors (the "Board") since August 2008.  During the one year period prior to the filing of the Petition Date, Mr. Steven's received $66,290.42 in director fees and expense reimbursements.

28.     Robert P. Burke became a director in August 2005.  During the one year period prior to the filing of the Petition Date, Mr. Burke received $45,566.56 in director fees and expense reimbursements.

29.     Malcom P. McLean, Jr., has served as a director since May 2002.  During the one year period prior to the filing of the Petition Date, Mr. McLean received $22,713.33 in director fees and expense reimbursements.

30.     Greggory B. Mendenhall has served as a director since May 2002.  During the one year period prior to the filing of the Petition Date, Mr. Mendenhall received $25,363.07 in director fees and expense reimbursements.

31.     Douglas E. Schimmel has been a director since August 2007.  During the one year period prior to the filing of the Petition Date, Mr. Schimmel received $56,754.54 in director fees and expense reimbursements.

32.     Nickel van Reesema served as a director from June 2001 through his resignation from the Board on August 17, 2011.  During the one year period that ended upon his resignation, Mr. Reesema received $35,000 in director fees and expense reimbursements.

## B.     Executive Officers

33.     Mark Tanner served as Chief Financial Officer and Vice President of Administration since January 1992.  In October 2011, Mr. Tanner resigned as Vice President and began serving as Co-Chief Executive Officer with Mr. William G. Gotimer, Jr.  Together they replaced Ms. Ivy Suter, who served as Chief Executive Officer from August 27, 2009 through October 21, 2011.  In the one year period prior to the Petition Date, Mr. Tanner received $245,467.21 in wages and expense reimbursement.  As of the Petition Date, Mr. Tanner's annual salary is $223,700.

34.     William G. Gotimer, Jr., was appointed Executive Vice President in April 2003 and has served as General Counsel since 1991.  As stated above, Mr. Gotimer has also served as Co-Chief Executive Officer since October 2011.  In the one year prior to the Petition Date, Mr. Gotimer received $349,857.97 in wages and expense reimbursement.  As of the Petition Date, Mr. Gotimer's annual salary is $311,700.

35.     Scott Fernandez has served as Chief Commercial Officer since May 2011. In the one year period prior to the Petition Date, Mr. Fernandez received $125,305.  As of the Petition Date,  Mr. Fernandez's annual salary is $218,700.

36.     Ed Morley has served as Vice President of Marine Operation since 1992. In the one year period prior to the Petition Date, Mr. Morley received $196,492.16 in wages and expense reimbursements.  As of the Petition Date, Mr. Morley's annual salary is $180,700.

37.     All of the executive officers receive employee medical, dental and retirement benefits.  Some of the executive officers have stock options.  Mr. Gotimer has an employment contract and Mr. Tanner and Mr. Fernandez each have a change of control severance arrangement.

## V.     DEBTOR'S ANNUAL GROSS REVENUES

38.     The Debtor's gross revenue for 2010 on an audited basis was $118,185,628.  From January 1, 2011, to October 31, 2011, the Debtor generated approximately $95,509,167 in unaudited gross revenues.

## VI.    AMOUNTS OWED TO VARIOUS CLASSES OF CREDITORS

### A.    Amounts owed to priority creditors

39.    The Debtor believes that it is current on all of its tax obligations, although there may be some that as of the filing, might not yet be due and owing.  Immediately prior to commencing its Chapter 11 case, the Company paid $14,140 in Delaware Franchise Taxes and approximately $22,000 to the Internal Revenue Service with respect to Heavy Use Taxes.  These payments were made by wire transfer.

40.    Other than the employee obligations set forth below, the Debtor believes that there are no other priority payments that will be outstanding as of the Petition Date.

### B.    Amounts Owed to Secured Creditors

#### (i)    The Wells Term Loan

41.    As of November 15, 2011, the outstanding principal balance of the Wells Term Loan was approximately $4.4 million.

#### (ii)    The Wells Revolver

42.    As of November 15, 2011, the outstanding amount owing under the Wells Revolver was approximately $5.9 million.

#### (iii)    The MARAD Bonds

43.    As of November 15, 2011, the amount owed under the MARAD Bonds is approximately $14 million.

#### (iv)    Senior Secured Notes

44.    As of November 15, 2011, the amount owned with respect to the Senior Secured Notes was approximately $86.5 million.

**C.      Amount of Unsecured Claims**

45.      As of November 15, 2011, the Debtor estimates that it has trade debt in the total amount of approximately $3 - $4 million.

**VII.    GENERAL DESCRIPTION AND APPROXIMATE VALUE OF DEBTOR'S CURRENT AND FIXED ASSETS**

46.      As of October 31, 2011, the Debtor's assets have a total unaudited value of approximately $102,728,977.  Most of this value is accounted for based on the estimated  appraised value of the Ro/Ro and TBC Barges and other fixed equipment associated with a shipping and trucking transportation business, such as containers, trailers, and chassis.

**VIII.   NUMBER OF EMPLOYEES AND AMOUNT OF WAGES OWED AS OF PETITION DATE**

47.      Trailer Bridge employs a total of approximately 158 employees, sixty-six (66) of whom are classified as salaried employees, sixty (60) of whom are classified as hourly employees, and thirty-two (32) of which are classified as employees paid by mileage.    Additionally, the Company employs the services of eighty-three (83) independent truckers who own and operate their own tractors and trailers.   As of the Petition Date, the Debtor will have approximately $1.5 million in accrued and unpaid prepetition employee wages.   No employee is owed more than the statutory cap of $11,725 entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## IX.    STATUS OF DEBTOR'S PAYROLL AND SALES TAX OBLIGATIONS

48.    The Debtor's payroll and sales tax obligations were current as of the Petition Date.  Immediately prior to filing, the Debtor paid approximately $4,528 on account of Florida sales and use taxes.

## X.    ANTICIPATED EMERGENCY RELIEF TO BE REQUESTED WITHIN 14 DAYS FROM THE PETITION DATE

49.    Contemporaneously with the filing of this Case Summary, the Debtor has sought emergency relief with respect to the following motions:

1.    Debtor's Motion for an Order Pursuant to Bankruptcy Rule 1007(c) Extending Time for the Debtor to File its Schedules and Statement of Financial Affairs and Request for Emergency Hearing

2.    Debtor's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, and 364, Fed. R. Bankr. P. 6003 (I) Authorizing Maintenance of Existing Bank Accounts, (II) Authorizing Use of Existing Business Forms, and (III) Authorizing Use of Existing Cash Management System and Request for Emergency Hearing

3.    Debtor's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, 507(a), 541, 1107(a) and 1108 and Bankruptcy Rule 6003 Authorizing Debtor to Pay Prepetition Wages, Compensation, and Employee Benefits and Request for Emergency Hearing

4.    Debtor's Motion for an Order Under Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtor's Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Requests by Utility Companies for Additional Adequate Assurance of Payment, and (III) Scheduling a Hearing with Respect to Contested Adequate Assurance of Payment Requests and Request for Emergency Hearing

5.    Debtor's Motion for Order Pursuant to Bankruptcy Code Sections 105, 363, 364, 1107 and 1108, and Bankruptcy Rule 6003 Authorizing Debtor's to (I) Maintain Existing Insurance Policies and Pay All Policy Premiums and Brokers' Fees Arising  Thereunder  and  (II)  Continue Insurance Premium Financing Programs and Pay Insurance Premium Financing Obligations Arising Thereunder or in Connection Therewith

and Request for Emergency Hearing

6.      Debtor's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 506(a), 507(a)(8), and 541 and Bankruptcy Rule 6003 Authorizing the Debtor to Pay Prepetition (I) Sales, Use, and Trust Fund Taxes, and (II) Other Taxes and Related Obligations to Certain Federal, State, and Local Governmental Entities and Request for Emergency Hearing

7.      Debtor's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, 506, 507(a), 553, 1107(a) and 1108 and Bankruptcy Rule 6003 Authorizing Continuation of Certain Customer Practices and Request for Emergency Hearing

8.      Debtor's Motion for Order Under Bankruptcy Code Sections 105(a), 363(b), 364, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Request for Emergency Hearing

9.      Debtor's Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 362(b), 506, 546(b), 1107(a), 1108 and 1129 and Bankruptcy Rule 6003 Authorizing Payment of Contractors and Service Providers in Satisfaction of Liens and Request for Emergency Hearing and Request for Emergency Hearing

10.     Debtor's Motion for Entry of Interim and Final Orders Pursuant to Section 361, 363 and 364(c) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Authorizing (A) Debtor in Possession to Obtain Secured Post-Petition Financing, (B) Granting Certain Liens and Adequate Protection, (C) Approving Agreements Relating to the Foregoing, (D) Modifying the Automatic Stay, (E) Authorizing Use of Cash Collateral (F) Granting Super-Priority Administrative Claim Status, (G) Scheduling a Final Hearing and Prescribing Form and Manner of Notice with Respect Thereto, and (H) Request for Emergency Hearing

I, Mark A. Tanner, Co-Chief Executive Officer and Chief Financial Officer of Trailer Bridge, Inc., declare under penalty of perjury that I have reviewed the foregoing "Case Summary" and that it is true and correct to the best of my knowledge, information and belief, with reliance on appropriate corporate officers and the Debtor's books and records.

Respectfully Submitted,

Dated:  Jacksonville, Florida
          November 16, 2011

Trailer Bridge, Inc., Debtor and
Debtor in Possession

*Mark A. Tanner*

Mark A. Tanner
Co-Chief Executive Officer and
Chief Financial Officer

Dated:  November 16, 2011
          Jacksonville, Florida

FOLEY & LARDNER LLP
/s/ Gardner F. Davis
Gardner F. Davis (FL 0471712)
E. Robert Meek (FL 0302910)
John J. Wolfel, Jr. (FL 030664)
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
P. O. Box 240
Jacksonville, FL 32201-0240
Telephone:  (904) 359-2000
Facsimile:  (904) 359-8700
Email:  gdavis@foley.com
           rmeek@foley.com
           jwolfel@foley.com

-and-

DLA PIPER LLP (US)

Gregg M. Galardi (NY 4535506)
Gabriella Zborovsky (NY 4851614)
Sarah E. Castle (NY 4932240)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
Email:  gregg.galardi@dlapiper.com

gabriella.zborovsky@dlapiper.com
sarah.castle@dlapiper.com

-and-

Craig Martin (DE 5032)
Cynthia E. Moh (DE 5041)
919 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email:  craig.martin@dlapiper.com
        cynthia.moh@dlapiper.com

*Proposed Co-Counsel for the Debtor and Debtor in Possession*